Mr. Simone. Mr. Loeb. Mr. Loeb. Okay. Mr. Loeb. May it please the Court, my name is Robert Loeb from the Department of Justice, and I represent Lloyda Rocha in this appeal. Ms. Rocha is an immigration officer who was being sued here in her personal capacity in a Bivens action for money damages by Omar Sissoko. Mr. Sissoko claims that Ms. Rocha erred in initiating and commencing expedited removal proceedings against him, causing him by statute to be detained. Mr. Sissoko claims by causing him to be placed in detention that Ms. Rocha violated his Fifth and Fourth Amendment rights in suing for money damages. As we explain in our brief to this Court, Mr. Sissoko's Bivens claims are barred by section 1252G. In that statute, it clearly states that jurisdiction is barred by a court to hear any cause or claim arising from the decision to commence a removal proceeding. Well, Mr. Sissoko's claim here against Ms. Rocha turns upon the fact that she initiated a removal proceeding causing him to be placed in detention. So you want us to sort of buy a but-for situation? Well, the only wrong here, which is alleged being committed, is that she didn't have a basis for initiating expedited removal proceedings. According to Mr. Sissoko, if I read their position correct, it should have been regular removal proceedings, not expedited removal proceedings. And she made an error in her assessment of the legal situation in initiating expedited removal proceedings which caused the detention. So it's not a but-for, but the only legal error here which they're alleging is the initiation of the – of the commencing of the removal proceedings. And here, as in American error, the commencement of a removal proceeding, any claims that was inappropriately commenced, is clearly within the scope of 1252G. Well, let me – you've got a pretty good case, but you've got problems, too.  I think you ought to – we ought to explore the problems. First of all, is there an expedited removal? Is it a proceeding in the technical sense in which the Supreme Court has found proceedings is used? You just boot the guy out, don't you? You have an expedited removal, which can then be challenged by habeas. There also can be proceedings on the asylum claim still related to your expedited removal. So there can be, in fact, proceedings. But there's no question that that statute is in relation to the expediting removal, as all the forms of removal, from expedited removal to – I think one of the things the 1996 Act tried to do is to consolidate there being one form of removal, expedited removal, but both are removal proceedings. Well, what makes you think they're proceedings? Well, you have a hearing before the immigration inspector, which then makes an assessment of the record. The question is, what's the level of review at that point? But that's still a hearing before the immigration inspector. Ironically, I think – Where here – what was the – the hearing before the immigration inspector here was, what, the discussion with Ms. Rocha? I believe there was a meeting with the two of them. And there was also, of course, a hearing before the nationalization officer about his CSS status. But I think in context, if you read 1252g, it clearly applies to removal. It's not dicing it between expedited and ordinary removal proceedings. Well, there's a separate provision about executing removal orders, but – and that certainly applies generally to removal orders, but there was no execution here. They're not complaining about that. But there's no – there's no expedited removal order, which is subject to that provision of A, which I think the Court asked about in its order. What you have here is the commencement of a removal proceeding, which that – of expedited removal. Was there ever a removal – an actual removal order issued? There was a – I think you'll find that there was an order issued by Rocha. What I found actually was a reference to an order, but I didn't find an order. I believe it's a – There was a document that said order attached, but there was no order attached in the excerpt. So I'm wondering if it was ever actually issued. I think it's that document which explains the basis for finding that – that Soto is subject to expedited removal. So there was – I'm just asking you technically. It wasn't order ever issued. I think that's the document. That's the only document. I think that is the expedited removal document. Well, can I pursue this? Because I think these are very technical questions. And so we've got the Green Court in the anti-Arab discrimination case saying that 1252G implies only the three discrete actions that the attorney general can take, decision or action, to commence proceedings, adjudicate cases, or execute removal orders. So were any proceedings commenced? Again, I – proceeding is a term of art here being you're commencing the removal process, which is what the statute – I mean, the statute goes on to say once you commence these expedited removal proceedings, the person is held in detention, the mandatory detention. So if you – But that doesn't commence in your proceeding. I mean, as Justice Scalia goes on, there are many other decisions or actions that may be part of the deportation process, such as the decision of an open investigation to survey the suspected violator, et cetera. So one of the actions may be to place them in removal. That doesn't commence the proceedings. It's – I – I mean, there are only three actions we can find that the statute applies to. And our argument, Your Honor, is that the initiation of the expedited removal is a commencing of the removal proceedings. The way the statute's framed, that unless you're raising an asylum claim, it may be the beginning and the end. Ms. Rocha was not trying to railroad Mr. – when making this finding that expedited removal applies, then offered, you wish to make an asylum claim, and he made an asylum claim at that time. And there was – would have been proceedings. There would have been an immigration judge hearing if that would have been deemed valid on that. So there was – there are proceedings even related to expedited removal, i.e., immigration judges hearing. But those proceedings before the I.J. hadn't started, have they? They – they hadn't. But they're commenced by the INS at the time, or now DHS, commencing the prosecution of them. Was there some file before the I.J.? What? Was there some document filed before an I.J.? There was, I think, an asylum claim raised by – No, no. She issues the order. He's to be placed in removal. Right. Is there any document filed with the court at that point? At that point, he's placed in removal. No, Your Honor. I don't think so. I don't think it's a proceeding, but you can see the problem. Your Honor, I can't. Let me – let me – I think I – I guess I'd like to regress to my argument about even if 1252g in its plain terms doesn't bar this. Well, that's a extreme question. We've got to be very exact in this. I have two questions, which I hope you'll get to as you go on. One is AADC, American Arab, was sort of structured a little backwards, because first it went through an exegesis of 1252g. But then it went into the question of whether if there were a constitutional problem, essentially whether 1252g should be read otherwise. That's what I understood him to be doing. Right. Right? So we essentially – so I guess my question is, does that problem arise here, i.e., the prospect, the need to read 252g perhaps more narrowly than one might otherwise because there might otherwise be no redress for constitutional violation? I think the short answer is that in – like you said, in American Arab itself, there was – they were dealing with a constitutional claim, and then they found there was not a reason to read that, any less. Because they found there was no viable constitutional claim. They – And that's basically the order in which it was done. Well, there was a constitutional claim there that the – there was a selective prosecution based on their First Amendment rights. Right. And here we have a question of – that you're basically a selective prosecution because of some animus. You wanted to get rid of me all. No, but I thought the main constitutional issue here was a Fourth Amendment claim. It's a Fourth Amendment claim saying you had no basis for putting me into detention. And that turns out to be true. Right? I mean, this is what's interesting about this case, because we now have – what I find intriguing and interesting here is that we have now a final agency determination that, in fact, he should not have been treated that way. Is that true? Well, we have – let me just give you my take on that. The immigration judge in that hearing found, and Mr. Sokol conceded, that he didn't have CSS status at that point. But he should not have been placed – he should not have been treated as inadmissible and should not have been placed in expedited removal proceedings. Is that not right? Basically, I find that the notice on the advance parole wasn't sufficient, that he would have lost his status to apply for adjustment, and that he should therefore still be permitted to adjust based on his marriage. Because he wasn't inadmissible. If he wasn't inadmissible, he wasn't subject to expedited removal. Am I wrong about that? I don't think the immigration judge's decision is all entirely clear, having read it many times. And, of course, this is like the prior case. In a qualified immunity case, you can't require Inspector Roach to have been treated that way. No, but that's not what I'm asking you. What I'm asking you is – Right. I'm trying to go step by step, because this is enormously complicated. Right. And then I want to get to the question that we asked you to address. Right. Well, I'm going to start with the 1252G, which I find actually harder than the 12 – harder to understand why it isn't a preclusion of jurisdiction than the 1252G. But you apparently don't, and I'd be curious about why. So, but to go back a step, we at least have to go on here on the assumption, it seems to me, that there may well have been a Fourth Amendment violation. What you then do with qualified immunity is another question, but at least that there may well have been a Fourth Amendment violation. They argue in their brief, and I think your question suggests, is, well, should we read 1252G not to apply to this context because there is a constitutional claim here? And the underlying assumption there is there must be an opportunity for a monetary redress for a constitutional claim. However, the Supreme Court, in the Chaliki case, in this Court in Berry, have explained when Congress has set out any – All right. But on that, you really have a procedural problem. At least it's my view that you do. That issue was not before us, because the judge said that you had not raised it properly, and this all came up in a Bill 59 motion, and she said something about, well, maybe there'd be a constitutional problem, but she never ruled on it, and it's not certified. Do you disagree with that? She did certify. She first said she shouldn't get to it, but I believe she got to it, first after grousing that we should be got to it and then got to it. No, she didn't. All she ever said was it'd be a problem. That's all she ever said. She never decides the question, and I don't see how it's certified before us. And we've – we certified – Everything she ruled on. But if she didn't rule on it, you didn't certify it. Well, I think it's still in your construction of 1252g, and if you're – and I'm just – I think the two arguments work together and that they are intertwined. Part of your argument is that you have to read 1252 very, you know, narrowly. I don't have an argument. The constitutional claim. But the presumption is that there must be a constitutional claim, there must be availability of evidence actions, and we must be very careful to permit that evidence action, not to read 1252g to preclude it. But the other side of that coin, you know, whether you're right or not about whether it was preserved in this case, maybe we need to appeal for final judgment on that ultimately. The other side of that coin is that the Supreme Court has rejected that notion that there has to be the availability of a Bivens damage remedy. Well, that may be right, but I do think you have a procedural problem on that question. Right. But in your construction of 1252g, you don't need to be so cautious to say, well, this statute can't be read to preclude constitutional claims. Where Congress is saying – where Congress provides a detailed list of remedies and rights, and this Court says where there's some remedy available, you don't even have a constitutional claim. So reading a statute narrowly to avoid a nonexistent cause of Bivens cause of action seems to me is a related point. To avoid – to read a statute narrowly to avoid something, first you have to know whether there is something there to avoid. And here there is no something to avoid because there is no valid Bivens action. So I think the two are related. What about the question we asked you in our order? Why – I'm just curious about why you seem very intent on relying on 1252g and not on 1252a2a. Well, a2a refers to, as you were saying, to the – to jurisdiction to review and ultimately entertain a cause or claim arising from an order of removal, an execution of an order of removal, an operation, an implementation of an order of removal. And here ultimately there was not an order of removal. So it's not – I think it's clear this case is about the commencement of the expedited removal proceedings. And I hadn't intuited the notion that we were going to parse the word proceeding so narrowly, but that's a question. But this provision says that there is no jurisdiction over any determination, it says, and it's not clear what any determination it's referring to. That's ambiguous. Then it says any cause or claim arising from the implementation or operation of an order. Well, we don't have the implementation or operation of an order because there was no order executed, order of removal here. It was never – they never actually tried to implement the order of removal except for the – But it's really interesting because I haven't – Well, let me backtrack on that now. I'm going to – we have Inspector Rocha making the finding that expedited removal is an order and they're placed in detention, which is, in fact, the implementation of what Rocha did. So maybe Your Honor, you know, is right that there is a nexus here between the judicial review, but also then it goes to, you know, what a question if it's an order, what's a proceeding. I think all those things right in context here is Congress is making sort of one definition of a removal and clearly in this provision, A2 is speaking to expedited removal proceedings. So there's no question the order is referring to expedited removal order and that's what Rocha did enter was a removal order. Let me ask you on the proceedings to get back to that for a moment. If a sheriff invites – picks somebody up and puts them in the county jail, does that commence proceedings? Don't proceedings commence when the DA files a charge in the county court? When the DA files a charge in the county court, does that commence? When he files charges against the man the sheriff has picked up, does that commence one of the proceedings? I couldn't say, Your Honor. I'm not – What do you think? I would think that the initiation of the charges would be the commencement of the proceeding. You'd have an assignment of a case number and name.  the proceeding? No, the proceeding was before that was a, as you see in the record, there was a form filled out by Inspector Rocha saying that he had no CSS status, that he had 2A numbers, he had no documentation allowing him back into the country now that his advance parole has been revoked. Where did that document go, then? There was – where did that document go? That document went – excuse me, Your Honor. That document went on the August 90 – let me see if I can get my timeline here. On August 26, 1997, that was issued. No, where did it go is my question. Where did it go? It went into his immigration file. It went into his file. Is that right? I – if Congress sets up the one man – It sounds to me like it's going before an officer to begin the proceeding. In the context of expedited removal, Congress set up the immigration officer to be the judge and jury, I guess. That's part of the – part of your – There are many steps, as Justice Scalia points out, that immigration officers take. The question is, was this a proceeding? That – that is the commencement of the expedited removal, and they're complaining that they commenced the expedited removal, and that caused the – the detention. So the two are linked together. It may not be a proceeding. You see the problem. I understand how you could parse that. I – Definitive, but I think it is a problem for you. What is your understanding of – if we were to somehow get over all these humps and get to the merits of anything here, what about the IJ and BIA finding? Are we bound by it? Do we reconsider the question of whether or not this person was, in fact, an admissible or not an admissible, or what? You're not – you're not bound by it because Inspector Roach is not privy to that proceeding and is – he can't have collateral. You're standing up here representing her as the Federal Government. I'm representing her in her individual capacity. She has a right to pick her own lawyer. We offer our services to her. She agrees to accept it. So, you know, I don't think she should be – I don't know the answer to this. I really think it's sort of interesting. I'm not sure it would be collateral estoppel anyway because it's not a court, but it's an interesting problem because I assume that the agency would prefer that we not – in general, that we accept their conclusions rather than reconsider them. I mean, obviously, that's true, Your Honor. But the question here is – and I think you can get to this in the qualified immunity sort of – whether it's established law element. As you're looking, you know, six years beforehand, you have an immigration inspector who's faced with an alien coming to the border who has two A-numbers, which basically is like having two driver's licenses or two passports, has used those two A-numbers to twice seek CSS status. The first time it was rejected. Then he got his story a little straighter, and the second time he was given prima facie status. The immigration inspector at Dulles Airport in Washington noticed these irregularities as being great indicias of fraud and didn't allow him to enter and sent him to deferred inspection here. And the question is, is a reasonable officer in that context committing an unlawful – clearly established unlawful act in initiating removal proceedings after that immigration inspector learns that, in fact, the CSS status was, in fact, bogus and was rejected now? This is a record question that I've been trying to figure out. Did she – did Ms. Rocha rely on fraud or did she rely on the invalidity on invalid papers when she instigated the proceedings? Does that matter? It doesn't matter. The burden under the statute is upon the alien to show by clear and beyond a doubt, almost like the criminal standard, that they have a right to be admitted. Okay. So if, in fact, Mr. Sotomayor never left the country and this fraud was determined, there would have been a regular removal proceeding brought against him based upon a revocation of his status and fraud. All right. But that's really the problem. But this is different because he's at the border and he has a burden now of showing that he has the right to come into this country by clear and beyond a doubt. So they withhold that question so they can find the validity of these advanced parole documents. They find that it's not valid. The district director revokes that advanced parole. So you've got a guy with basically no advanced parole at that point. And now you can say that, you know, the immigration judge years after the fact says, oh, that was an erroneous thing. But, you know, clearly you don't want to rule where immigration inspectors, where they see or suspect fraud. Really, you know, in a post-9-11 world, you want people to be vigilant in guarding our borders. And if they had to be worried about being sued in their personal capacity for money damages, just because when they find fraud and they suspect it, they act upon it. And it actually turns out before the immigration judge, it turns out his CFS status was invalid. During this case, he took the Fifth Amendment when he was questioned about his status because he had sworn statements which contradicted each other. But, you know, instead of being given a gold medal for finding someone who was committing fraud against this government to allow his entry, she's being sued for money damages. And that's, you know, qualified immunity means anything. It means that immigration inspectors or Federal officials, you know, all over this country have to be able to vigorously enforce the law without being afraid of suit. If this case goes forward, it sends a message to every immigration inspector that they, too, you know, are subject to suit by just merely enforcing the law. May I ask just one question? You can ask. As I understand, he was in custody twice. They released him once and then he was in custody again a second time? Right, Your Honor. He was injured the second time that he was in custody by some conduct of the detention people. Is that right? That's the allegation. He had to have surgery. That's the allegation. What happened? Where does that claim stand now? There's a Federal TOR Claim Act suit which is still pending against the United States. So the Bivens situation is all right in that case or the Federal TOR Claim Act? No, there's two defendants. The only one who has the right to the interlocutory appeal is the Bivens defendant. What I'm trying to find out is how far do we go? How far do we go with the Bivens situation? When is it all right and when is it not? The Congress has provided the TOR Claim Act.  We don't argue that 1252G precludes injuries while you're being detained because what it pertains to is the commencement of the proceeding, not your treatment. One more. They make an argument in their brief about the advanced parole that you had to treat under this regulation 1.1Q to treat them as not being an arriving alien. And one point I think maybe we didn't make thoroughly enough in our brief, which we did make below and I want to make clear, is this regulation they were relying on was not in effect at the time. If you look at 63 Federal Register 19382, it says that this regulation didn't go into effect until April 198, which is eight months after the fact. So I'm way over the time. You are over time, but I think you've said what you needed to say. So thank you very much. Thank you very much. And we will give you a little more time probably. I may at least go to Martin Simone for appellee. In our procedure here, we're not talking about a situation where a proceeding is even the process. We're talking about the process of proceeding, due process violations in the proceeding. That's, as the Court issued, there is not a, the expedited removal proceeding is summary. When Rocha started by asking that Sissoko, Mr. Sissoko, be placed in the proceeding, she initiated that contact with a supervisor on the telephone ultimately, and there was never an order, as the Court astutely pointed out, of expedited removal. He was just given the detention. Well, but there is a form in the record that says order, order, something about order of removal, order attached. Do you think that there never was an order? There never was an order. We've never discovered an order. It's not in the Freedom of Information Act, and it's not in the record anywhere. He was not served until the actual proceedings commenced with any type of notice of proceedings. Which order? Which proceedings commenced? The proceedings before Judge Banks, the immigration judge. That was served with him on counsel the day that they went there, like in February, I think, of 2000, and eventually Judge Banks issued his decision in December of 2000, saying that he was not an arriving alien, that, in fact, under the Flutie doctrine, and as it came down here, he had never left, because his departure was brief, casual, and instant. Well, how then, if there was no order, how does the proceeding work? Because he invoked the asylum? Well, I mean, the asylum is an automatic part of the 235 process. That's why he became – that's why he was detained, right? Otherwise, he would have just been left. No, no. See, now the Court gets to the real crux of this. He's a CS-1. He's been a CS-1 since 1991. But under the way the Deputy – way Officer or Inspector or whatever she's called, Rocha, was proceeding, if he hadn't invoked the asylum provision, he would have just been gone. Is that not right? I think they automatically give you the asylum procedure. They come down and they read you in the – they actually read you and ask you, do you have a reasonable fear of persecution if we return you? And that's now automatic in order because this whole act came about as a result of people arriving and then delaying the process and being here several years by filing asylum and then filing the appeal process. All right. So I – But – so in this case, Mr. Sotoko did not have that persecution. He didn't ask for asylum. He was placed in detention. There was no order of expediting. So he was placed in detention because he asked for asylum. Is that not right? No. He was placed in detention because his applications for legalization, according to Rocha, had been denied. But no one, no one, Letty or Ms. Fabia, no one at the legalization – I thought the only – my understanding was that the only reason that he was in detention as opposed to shipped out was because he invoked asylum proceeding – asylum protections, which he then withdrew. There was no final order. I'm not sure. It's not clear that that was it. They give you a – they automatically provide you with the asylum petition. Did he ever invoke this? I don't believe he ever invoked this. That was not my understanding. I think he was there, and then he was injured about two to three days after the second detention. Now, the first detention is interesting because they take him – she says that his legalization applications had been denied. The Court understands here that as a CS1, the immigration officers at the border do not have any ability. In fact, there's a confidentiality. Are you going to address the jurisdictional questions, which I think are serious and complicated? All right. Well, under 1252a2a, the Court references Sinclair and Hikawa, I think it was. Yes. Under Sinclair, the Court said there is always habeas jurisdiction. They go back to the Article 1, Section 9 of the Constitution saying 1789 – since 1789, that type of habeas exists, and nobody can take away no cord, no log, and Congress can't take that away from us. Well, but doesn't that cut against Joe Bivens' action here? It did. It could happen. In fact, he did, as I understand it, file a habeas action. Right. Which was – which the U.S. attorney argued there was no jurisdiction over. All right. So but – And the Court accepted that, and eventually that went away. I have no idea, because that file is now in the Laguna Niguel, and it's impossible to retrieve. It's just time to find out ultimately. But what we knew of the briefing, what I could find from the briefing early on – You can't get records from a court? We can. It's a matter of making an appointment, because all the records are down there now, and I have to go and get this actual file and get this habeas petition out. And it takes quite a process to go to Laguna Niguel, make an appointment, go down there. And because recently, after the court sentence notice here, I was curious as to where that habeas went to. I started that inquiry process and went unable to get an ultimate answer. Was the habeas not in a court? What court was it in? It was in the U.S. District Court. Where? In Los Angeles. And there's no record of that? No record. The file, we checked on it last week when we got your notice, and it said that that file had been transferred to Laguna Niguel. And we needed an appointment to go get that file. All right. But let's assume that you're arguing that he should have a bivens action because he doesn't have an alternative. But a possible alternative would be a habeas action, right? Well, we're talking about two different things, aren't we? We're talking about the expedited removal proceedings, per se. What are your remedies there? He proceeded through all those remedies, and Judge Banks said, you can adjust. You're here. You never left. We won. We won that case. The Court is now focusing on something we won. We're saying bivens is, as in Medina and as the dissent in Huffrey says, is about his money damages for what they did. Medina was a Federal Tort Claims Act case, so that's really quite different. But they also, I mean, in Victor, she talks, the Court there talks about bivens, and the dissent in Huffrey talks about bivens being applicable. But to me, the problem is this. A, do the statutory preclusion, jurisdictional preclusion provisions, 1252G and 1252A2A, on their face preclude jurisdiction over this case? And do they need to be read against a constitutional problem, which would, is deprivation of any ability to review a constitutional determination? If there isn't an inability to review the constitutional issue because you could do it by habeas, then you're in a weaker position. I understand completely. And even more so in this case, I'll give the Court more to think about. Because he was CS1. Jurisdiction of this case lied in the Eastern District of California, which had jurisdiction over the CS cases. When he came to the border, if they wanted, that is, immigration wanted to do anything, they had to comport with the orders of the Eastern District. And they didn't do that. They questioned him. They sent him to legalization. Legalization followed none of the prescribed orders. I still don't understand. But you're not answering the question of what? I understand you're saying that. We have 1252G here and 1252A2A. Why do they not preclude us and district court from deciding, from entertaining a Bivens action? Because the Bivens action is the only action that allows a monetary relief. It exists independently. Why does that matter? Because if there is no relief, if there is no other relief, you go through the proceedings  And now this is an action. All right. 1252A2A says that notwithstanding any other provision of law, no court shall have jurisdiction to review, except as provided in subsection E, which deals with a specialized habeas form, any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to such and such. Now, why isn't this a cause or claim arising from or relating to the implementation Just take the implementation of an order of removal pursuant to such and such. Yeah, but now this is an after-the-fact situation. This is over. We're not contesting the initial situation. It doesn't say that. It says to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal. And then we get to your next question, is that there is then no, nothing but a constitutional issue that remains. And we run into the same, the problem that arises in Webster v. Doe, that it crosses across serious constitutional issues. Your argument then has to turn to the fact that there has to be a certain kind of constitutional remedy, i.e., one for money damages, rather than a constitutional remedy, i.e., the availability of habeas to get out of there. And he did get out of there. But he didn't get out because of a habeas or anything. He got out eventually because he was found to be corrupt. Right. But eventually he got out. And eventually somebody heard about it. Eventually they put him into removal proceedings and he could bond out. But that was after 88 days and an operation and an injury. And it was all based on a lie, based on many lies by Rosha. But we'll go, I'm trying to answer your question in that there are two distinct things. Bivens remedy for monetary damage is provided by Bivens. It's there. I'm not making it up. It is for constitutional violations. There can be a money remedy. It doesn't exist within this procedure. And Medina very clearly says that's true. We can't fathom a constitutional protection, not granted, where for monetary difference being excluded by 1252G or, in this case, even better, the 1252A2A. They're in the same boat. I think 1252G and 1252A2A, the Court has pointed out. Except that 1252G deals with certain – this one deals directly with expedited removal. So that's why it seems to me to be. Right. And none of the cases have yet dealt with expedited removal. So as the Court pointed out earlier in the argument, is this – has proceedings been commenced under 1252G, and that maybe is their way out. But here, this is a situation where expedited removal should have never occurred to begin with. And it was over. So there are two sides of this. There was never a basis for expedited removal. Can we never attack that? We can never ask for a remedy from that? Habeas. Well, you ultimately got a remedy. The remedy you got was he is staying here. He isn't. And so what you don't have a remedy for, it seems to me, and what you need to focus on is the fact that he wasn't detained for 88 days. But he did have a remedy. And so your question is really whether there is some constitutional requirement that he have a damages remedy for being illegally detained, assuming he was illegally detained. Right. And then I say then it gets back to your very question. And the question is, if we don't give Mr. Sasoco or Bivens remedy here, have we deprived him of some basic constitutional right as granted by Bivens? And that's the question. That goes back to Webster v. Sasoco. Bivens doesn't give anybody a constitutional right. It gives people a remedy for a violation. A remedy. And that remedy is money damages. That's not a constitutionally required remedy. Nobody has ever suggested that. But it is a remedy. It is a remedy giving money damages for constitutional violations. And that's what we say here. That Rocha's action in the one hand, in the procedures, that we went through. We did our procedures. We found that it was adjudicated in Mr. Sasoco's favor. We won that case. And now we're saying that Ms. Rocha, because of what she did, and the Court has even found that, and more in the extremis, that she didn't have any immunity based on everything that she did. Not only is there jurisdiction, but she doesn't have immunity, which is another large component of this thing, that she acted in such a manner as to strip herself of any of these things. That's why we're here, is to decide whether we agree with that or not. Right. That she acted in such a manner to strip herself of any rights in here. And the Court so held that, that the monetary damages would lie here for these constitutional violations perpetrated by this individual under a color of law. This is why we're here. Why are you so emphatic on the fact that she can't qualify for qualified immunity? Am I emphatic? I know that now. You're being very persuasive. I feel that when we talk about the standard of review, the noble review here, we talk about the fact that Ms. Rocha has hoisted herself on her own petard, if you want here. We've never used one piece of evidence from the plaintiff to indict her in this manner. She's done it all with her own paperwork and with her colleagues in the INS at the time. They deny any support for her in this. She never talked to anybody. Well, she must have talked to somebody because her information was correct the second time, right?  Her information was wrong. It was never revoked. She was not denied. Determination was made that he was improperly granted. Perhaps her exact terminology was incorrect, but her basic point, which was that he was determined to have been ineligible for the CSS status, was correct. And if anybody at legalization, which is a separate place because of the confidentiality requirements, no one admits that we talked to. Letty is put down twice. Doesn't that look a little perfunctory to the Court? But why does any of this matter? The information was correct. So you have three days, perhaps, of a problem. Oh, okay. Now the Court is telling me that an officer who suspects a defendant, a felon on the street, knowing that an informant may have told him this guy did something, he can bring him in. And if later on it proves to be true, he can violate all of his rights in the process. And that's just not the way it is in this country. It's just not that way. Ms. Rocha lied, and she lied over and over again. Her supervisor had to bail her out in May. He had to call Watson at legalization and ask, what do we have to do here? Because she took somebody in custody without any basis of taking her in custody. None. That seems to me, if we can get over these jurisdictional hopes, which you're not willing to focus on, then we, you may have something in May. But later on. Well, no. I mean, even in August. You have to understand that. When she makes an election to take him into custody, she does not know, no one has reinforced or corroborated her story that she, in fact, talked to anybody. In fact, they have denied she talked to anybody. Tabea is the lady, Ms. Tabea was the one who put, who actually interviews her until August 27th or 26th there. Not Letty. And look at the paperwork. When Rocha puts him back into custody, she writes Letty twice. She doesn't write Tabea. Tabea, in her deposition, which we presented to the Court, the excerpt says, I never talked to anybody. I put his file back on the desk. I never had a phone call. I never had a supervisor come over. Nobody took it away. There's no way anybody would have known. And not only that, she said, this wasn't a revocation hearing I had with him. This was just a re-interview. I didn't give him any of the standards from the CS cases. I didn't give him 20 days to bring in more evidence. And I didn't take away his work authorization because Rocha already had it. But I don't even know who Rocha is. I never talked to her. And Letty said, I don't know who Rocha is. And if anybody called me, I would have never given them any information. That's the purpose here. We have someone acting to try to keep someone outside the country that's legally with his APV had a right to be back in here, not just paroled. And then we get into the whole issue of the SOS. But if you have these violations prior to the commencement of a proceeding, then we don't have 1252G or 1252A2A cases. We don't have them because there is no commencement. Therefore, these are violations of rights. Rocha had no rights. She deferred him for four months and never did anything about it because someone said there could be a revocation hearing. But no one told them, no one bothered to look at the very lengthy nine-year case in the Eastern District that had all these rules and regulations which we put before this Court on what you do when you find a CS-1 applicant. This is what you have to do. Nobody did that. And in legalization, people said nobody called us to do anything. And we couldn't tell them if they did do that because it's a walkaway. Legalization was a walkaway. I'm having trouble understanding that as well. If clearly anything that was told to the legalization people of a factual matter was confidential. But the question of whether or not they were eligible for CSS status couldn't possibly be confidential. No, that's on a computer screen. I mean, the fact of the matter, they had two A numbers or whatever, that's not like having two driver's licenses. Many people are. I'm not asking that. I'm saying eventually. Oh, no. If the CSS status was revoked, that has to be communicated through the system. It would have been on the system eventually. But it couldn't have been on there. So that can't be a confidentiality problem. No, that it was here. But it can't be. It wasn't communicated that day, and also the procedures weren't followed. I mean, he had 20 days when he walked out of that office. He also had a right to a notice from the legalization office of what's going to happen. The notice sent to him, Mr. Sotoko, to come and see us on August 26th, doesn't say this is a revocation. And are violations of this consent decree Fourth Amendment problems? I would say they're at best, I mean, at worst contempt problems. All right. But they may well be contempt problems. Is it a Fourth Amendment problem? Yes, they're Fourth Amendment problems. Why? Because these are rights established between the INS and the complaining parties in the court based on the rights. So if they're not constitutional, they're, I guess, at worst, contractual rights with the INS that have been brought in. But they are constitutional rights. These are the rights of people in legalization. This is what happened. And they were extended through the CSS cases. Eventually, you're right. The screen, don't forget, when Mr. Sotoko came in, a screen said, I have CSS1 application. Mr. Sotoko did everything correctly. I mean, whether he lied in the initial stages to get this status is not the issue here. The issue is when presented with these people who had the right and the procedure with him, he had everything. He had an APD. He was gone a week. His father had died. It was brief, casual, and innocent. Nothing had changed in the 10 days he was gone. Not only that, the new law hadn't come into effect when he asked for readmissions on March 29th. There's a form in the record, in the excerpts, page 6, I believe, which is signed by Rocha, and it says, there's a box checked, ordered removed, inadmissible by INS. Section 235B1, parentheses, order detached. But you say he was, in fact, never ordered removed. This was Rocha's statement, but there's not an order of removal here. She's not ---- So ordered removed is not an order of removal. I mean, I'm not an immigration lawyer, but ---- As far as we know, there should be a separate document. I'm not really, you know, so hung up on that, that there probably, there never was an order of removal. Things changed. He got injured. Things were pushed aside, and eventually he was able to be bonded out. So it became lost in the shuffle whether that was there. Because I think the commencement, once an order is signed, the action's over. So it's either this shouldn't have occurred or after it occurred, we have a right to see what happened, that they did it inappropriately. Okay. Thank you very much. Thank you for your help. May we give you another minute or so? Yes, please. Okay. I think Your Honor's right on page 6. We have here a document which says order removed. And if we go back to the jurisdictional points, we have, you know, we have G and we have that A provision. So we have an order here in which the execution of that order means that they're being mandatorily detained under the statute, and that's what they're complaining about, and that's barred. Well, but the question is, do we have the order? He just said there was no order in the record. Well, absent the order, he wouldn't have been put in detention. Agent Inspector Rocha is not. That's their claim. Their claim is he was put in detention properly, i.e., without an order. Inspector Rocha was not the one to decide whether to detain him or not. Basically, this is what Rocha did. There was a natural consequence from that order. Where is the order? There wasn't in the documents in the pleadings below, Your Honor. So this is the document. I'm sorry. You say there is an order somewhere? This says order removed. This says attached order. There is no attached order in the pleadings below and the exhibits which were submitted below. This is what was submitted below. All right. But then we don't have an order. Is that right? Whether or not it is. We're deciding on this record. Right, Your Honor. There's no order before us. Okay. So where is the order? I would submit that this form itself notes sufficiently that the reason for and the fact of the removal of being ordered, whether, in fact, there needs to be a separate attached order, even though there's a little parenthetical here. It doesn't matter. Can I tell you my general problem? Go ahead. It seems to me Bivens is the law of the land. If people seize, if Federal agents seize somebody without constitutional right, money damages can be awarded against the Federal Government. Now, the Federal Government is now on the defensive. It's got to prove that it had some legal basis. And it's got to prove that Congress in some way has circumscribed the Bivens right. And we have to be very technical. This is a very technical field. And you don't have an order, you don't have an order. If it's not a proceeding, it's not a proceeding. That's the sort of thing that you're up against. Well, then, whoever, I mean, the role of Inspector Rocha here was not the one deciding whether to be detained or not. The role of Inspector Rocha was to decide whether Mr. Sissoko had adequate documentation to be allowed in this country. He had a duty to show so by clear and beyond a doubt. This document, which I'm pointing on page 6, is her finding that he didn't meet that standard. Then other people within the INS at that point then placed, based on this document, maybe there was another order which isn't part of the record, I don't know, okay, placed him in detention because they considered this to be the commencement of the expedited removal, the finding that the person was subject to expedited removal. So what's the wrong of Agent Rocha here? His question is, could a reasonable officer in her position have found that? Well, now you've got an immunity question, but that's not before us. Well, it is before us if we get over the jurisdictional problem. Right. Obviously, that's being raised here as well. But there's a question as to whether the harm here is still the constitutional violation, which they're asserting is, well, you caused me to be put in detention because you found, you initiated this expedited removal. Now, whether or not there was a proper order or not doesn't go to the question as they're claiming you didn't have a factual predicate for that. Right. And they're also claiming that. Now, if we were to put aside what I think are these serious jurisdictional problems, their claim is that she, there was at least a conflict in the record or inferences could be drawn from the record regarding whether she had adequate information or any, to have probable cause on the thesis that she couldn't have gotten the information she says she got. Right. But under their own complaint, and we quoted on page 20 of our reply brief, on their own complaint, the First Amendment complaint, they said that Mr. Sissoko admitted at their meeting on August 26th in that afternoon, he said, I found out that earlier this morning your CSS status is now being rejected. So, you know. But does it matter that, if it's correct, I don't know if it's correct, that under the consent decree it couldn't be immediately rejected? I mean, it could be an issue because it would mean that he's not out of status then at the time that he was thrown into jail. Under the procedures for someone who's in this country, there would have been a 15-day delay. But again, Agent Rocha's job is not implementing the CSS statute. It's saying, did this person give me, at the border, clear and convincing, beyond a doubt, evidence they belong in this country? So you have the two A numbers. You have the whole fraudulent story of how he got here and how he stayed here. We have his story being rejected once by the NS and him changing it. And then basically they wait and they wait. And then on August 26th, it's clear that now his second CSS status is being rejected by INS as well. If he had been in the country, there would have been a 15-day delay before initiating removal proceedings. But he wasn't in the country where you needed to have initiating removal proceedings. He was at the border still as a legal fiction. And there's a question of whether he had proper documentation. At this point, you know, Agent Rocha did not act clearly and, you know, objectively on this. Kagan. It's odd, isn't it, that she had the same paragraph in the May document when he hadn't been denied. It was clear that the one had been denied and the other had not. And once that was caught, they released him. They dropped it. You don't make any claim about the three-day, you know, error. That was just an administrative error. As you're aware, there's thousands of these cases and there's lots of administrative errors. If all these lead to constitutional damage claims, we'll all be in trouble. So we have the situation now where they wait to whether the second CSS status will also be rejected. Of course, you know, it was rejected for the same reason. It was rejected for the same reason as the first, but they were, you know, acted diligently and waited. And upon August 26th finding out whether she talked to Letty or talked to someone else, you know, and whether she remembered incorrectly three years later or not, that's really, you know, it doesn't amount to hanging a constitutional claim on. The fact is he didn't have CSS status. The I.J. later on found that he didn't have CSS status. So there's no, you know, again, Agent Rocha looking at the standard, which could a reasonable officer, that's the Fourth Amendment standard, find there was a basis for placing someone in detention or here or here initiating proceedings. And that has to be looked under the rubric of the statute here, which says were there clear documentation and beyond a doubt allowing Mr. Soka to enter. One more point, which I didn't get. Very over time. It's really close. Is that the district court didn't reject our qualified immunity, but actually suspended liability against Inspector Rocha. Now, if you're going to say, oh, there's a conflict in testimony, all right, what conflict in testimony goes to go to the jury, you don't just assume Inspector Rocha's lying and then has something vendetta against the Soka and rule against her in the matter. So there's just an internal inconsistency which just can't be sustained here in the district court's opinion. So at minimum, Your Honor, thank you for your indulgence. Thank you, Your Honor. And thank both of you for your arguments. And the case of Sosoko.
judges: Skopil, Noonan, Berzon